# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

LEFTY'S HOLDINGS, LLC, a Michigan limited
liability company, LEFTY'S CHEESESTEAKS
FRANCHISING, LLC, a Michigan limited liability
company,

        Plaintiffs,                            Case No.

v.

ALLIE T. MALLAD, an individual,
LEFTY'S JACKSON LLC, a Michigan limited
liability company; LEFTY'S
KALAMAZOO LLC, a Michigan limited
liability company; LEFTY'S WESTLAND,
LLC, a Michigan limited
liability company, and ATM BRANDS BATTLE
CREEK LLC, a Michigan limited liability company,

        Defendants.
_____

David H. Fink (P28235)
Nathan J. Fink (P75185)
Calder A.L. Burgam (P87203)
FINK BRESSACK
38500 Woodward Ave., Suite 350
Bloomfield Hills, MI 48304
(248) 971-2500
*Counsel for Plaintiffs Lefty's Holdings,*
*LLC and Lefty's Cheesesteaks*
*Franchising, LLC*

_____

1

## VERIFIED COMPLAINT

NOW COME Plaintiffs, Lefty's Holdings, LLC and its subsidiary, Lefty's Cheesesteaks Franchising, LLC, both Michigan limited liability companies, by and through their attorneys, FINK BRESSACK, and for their Complaint against Defendants, Allie T. Mallad ("Mallad"), and Mallad-owned entities, Lefty's Jackson, LLC, Lefty's Kalamazoo, LLC, Lefty's Westland, LLC, and ATM Brands Battle Creek, LLC, all Michigan limited liability companies ("Franchisees"), in the above-captioned matter, state as follows:

## <u>INTRODUCTION</u>

1.     Lefty's Holdings, LLC and Lefty's Cheesesteaks Franchising, LLC (collectively, "Lefty's") bring this action for breach of contract, trademark infringement, unfair competition, and trade dress infringement. Lefty's has duly notified Defendants of the termination of Defendants' relevant Franchises and Franchise Agreements with Defendants based on Defendants' multiple breaches of those agreements.  Defendants continue to improperly hold themselves out as Lefty's franchisees.

2.     Defendants' continued, unauthorized use and enjoyment of Lefty's trademarks, trade name, and trade dress constitute breaches of the Franchise Agreements and violates the Lanham Act, 15 U.S.C. §§ 1114, et seq. Lefty's seeks injunctive relief against Defendants for the reasons set forth below.

2

## PARTIES

3.      Lefty's Holdings, LLC and its subsidiary, Lefty's Cheesesteaks Franchising LLC, are Michigan limited liability companies with their principal place of business in Oakland County, Michigan. Lefty's Holdings, LLC owns the trade name, trademarks, and service marks, which it licenses to Lefty's Cheesesteaks Franchising, LLC to use in its franchising activities. Lefty's Franchisees, including the Defendants, are licensed to use the Lefty's trade name, trademarks, and service marks through Franchise Agreements with Lefty's Cheesesteaks Franchising, LLC.

4.      Defendant, Allie T. Mallad, is believed to be a resident of Florida or Oakland County, Michigan.

5.      Defendant Lefty's Jackson LLC is a Michigan limited liability company with a resident agent address of 23600 Michigan Ave., Dearborn, MI 48124 and operates a Lefty's restaurant in Jackson, Michigan.

6.      Defendant Lefty's Kalamazoo LLC is a Michigan limited liability company with a resident agent address of 23600 Michigan Ave., Dearborn, MI 48124 and operates a Lefty's restaurant in Kalamazoo, Michigan.

7.      Defendant Lefty's Westland, LLC is a Michigan limited liability company with a resident agent address of 16030 Michigan Ave., Suite 200, Dearborn, MI 48126, and operates a Lefty's restaurant in Westland, Michigan.

8.      Defendant ATM Brands Battle Creek LLC is a Michigan limited liability company with a resident agent address of 23600 Michigan Ave., Dearborn, MI 48124, and operates a Lefty's restaurant in Battle Creek, Michigan.

9.      At all relevant times, Mallad was a Class A Member, manager, and/or "a member in control" of the Lefty's Holdings, as the term is used in MCL §450.4515(1). Mallad owns 20% of equity in Lefty's Holdings and holds 200 of the Class A voting units and has held the title of CEO.

10.      The LLC Defendants, Lefty's Jackson LLC, Lefty's Kalamazoo LLC, Lefty's Westland, LLC, and ATM Brands Battle Creek LLC, all Michigan limited liability companies, are franchisees of Lefty's and believed to be owned in whole or in part by Mallad, operating pursuant to the terms of the April 17, 2020 so-called Master Agreement between Mallad and Lefty's majority owner, Nayfe Berry.

## **JURISDICTION AND VENUE**

11.      This Court has jurisdiction over this action pursuant to §§ 34(a) and 39 of the Lanham Act, 15 U.S.C. §§ 1116 & 1121; and 28 U.S.C. §§ 1331, 1338, & 1367(a).

12.      This Court has *in personam* jurisdiction over Defendants because they conduct business in this District and the events giving rise to Lefty's claims occurred in this District.

4

13.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because substantially all the events giving rise to the claims asserted in this lawsuit occurred in this District.

14.     Mallad had previously sued Lefty's Holdings, LLC and Lefty's Cheesesteaks Franchising, LLC as well as Nayfe and Sam Berry in the Wayne County Circuit Court. Those claims were dismissed with an order to arbitrate the parties' disputes pursuant to arbitration agreements. Exhibit 1.

## **FACTS**

### **Lefty's Famous Cheesesteaks, Hoagies, & Grill**

15.     Hussein "Sam" Berry, hereinafter referred to as "Sam," developed the concept of Lefty's as a cheesesteak fast food restaurant. With his mother, Nayfe Berry, Sam formed Lefty's Ventures, LLC to hold all of the Company's intellectual property, including, without limitation, Lefty's Cheesesteaks' trademarks, brands, licenses, recipes, etc.

16.     Lefty's Ventures previously entered into license agreements with several licensed Lefty's restaurants in the State of Michigan. Lefty's Ventures conveyed Lefty's intellectual property to Lefty's Holdings, which has licensed it to Lefty's Cheesesteaks Franchising, LLC to use in its franchising activities.

17.     At the time of the creation of Lefty's, Sam Berry had been diagnosed with stage 2 testicular cancer which had spread to his stomach and lymph nodes, and

for this reason, he placed the ownership of the company in the hands of the one person who he trusted most in the world, his mother.

18.     The business relationship between Sam and Nayfe continued, initially with her as a member of Lefty's Ventures, LLC, and now Lefty's Holdings, LLC and Sam running Lefty's operations.

19.     Defendant Mallad, a cousin of Nayfe by marriage, pursued a meeting with Sam in late 2019 or early 2020 with the objective of obtaining an interest in Lefty's. Ultimately, Sam accepted the invitation. Mallad told Sam that he could save the Company from eventual self-destruction by helping Sam to franchise the Lefty's concept nationally using his purportedly unique franchising savvy.[1]

20.     Mallad proposed that he trade a 5% interest in Red Effect, LLC, an essentially worthless company he owned (falsely represented to be a nationwide

---

[1] Mallad's pitch to Sam Berry was virtually identical to his online marketing of himself: "Recognized as an Ernst & Young Entrepreneur of the Year award winner, Mallad made his mark in franchising as one of the fastest-growing Little Caesars™ franchisees in company history. Heading up the California expansion of the Little Caesars™ brand with revenues topping $100 million, Mallad personally built and led a team of over 2000 employees and became the world's largest Little Caesars™ franchisee with 159 locations. Mallad went on to parlay his franchising success with 10 additional national brands including Golden Corral, Big O Tires, Arco AM/PM, Applebee's, Baskin-Robbins, Bruegger's Bagels, Mobil Oil, Chevron Oil, Ryder Truck and Jiffy Lube. Mallad amassed numerous prestigious industry awards and was named one of the Top 50 Franchisees in the US by Nation's Restaurant News Magazine." https://www.linkedin.com/in/allie-t-mallad-033b108b

empire of 200 franchises and with 200 more in the pipeline), for a 20% interest in Lefty's, which Sam had carefully nurtured into a profitable, successful business.

21.     At the time, Mallad vastly and intentionally misrepresented the success of Red Effect, verbally and in writing, to Sam, intending that Sam rely on his false statements to his detriment (and that of Lefty's) and agree to swap interests in the two companies.

22.     In truth, Red Effect had few operating locations (both Mallad-owned and franchised), showed negligible growth during the prior few years, had no significant number of legitimate prospects, was chronically operating at a significant financial loss and faced the prospect of litigation with unhappy partners, franchisees and landlords.

23.     Mallad was aware of Red Effect's bleak prospects as he negotiated for an ownership stake in Lefty's. In 2022, an arbitrator in a dispute between Red Effect and a Red Effect franchisee found that Mallad's Red Effect had abandoned its franchise system beginning in March 2020. Exhibit 2.

24.     Despite Red Effect's ongoing and concealed collapse, Mallad represented to Sam that Red Effect would soon be a billion-dollar company.

25.     On April 17, 2020, the Berrys and Mallad entered into a so-called Master Agreement (Exhibit 3) calling for the one-sided deal promoted by Mallad,

7

*i.e.*, Mallad to receive a 20% interest in Lefty's in exchange for a 5% interest in Red Effect (whose website now shows three locations nationwide).

26.     Following the execution of the Master Agreement, Lefty's Holdings, LLC was formed, and Nayfe and Sam Berry entered into an Operating Agreement (Exhibit 4) that governed the rights and responsibilities of Lefty's Holdings members. Under the Operating Agreement, the parties memorialized their agreement to wind down Lefty's Ventures, LLC and transfer ownership of Lefty's trademarks and trade names, etc. to Lefty's Holdings.

27.     Lefty's Holdings owns numerous federal registrations for the mark "LEFTY'S FAMOUS CHEESESTEAKS, HOAGIES, & GRILL" and related marks. Among those registrations are Registration Nos. 5959876, 6184336, 6175259, and others. Each of these registrations is in full force and effect.

28.     Lefty's Holdings, through the wholly-owned subsidiary Lefty's Franchising, LLC, has the exclusive right to license others to use the Lefty's marks and trade name and has used them at all times relevant to this action to identify its restaurants and products associated with those restaurants.

29.     The trade dress of Lefty's restaurants includes the signage, lettering style, color scheme, exterior appearance, floor plans, and décor (including, without limitation, menu boards, display racks, and servers' uniforms) that are featured at the restaurants operated by Lefty's franchisees.

30.     The Lefty's trade dress consists of arbitrary embellishments primarily adopted for the purpose of identification and individuality and is nonfunctional.

31.     The Lefty's trademarks and trade dress are utilized in interstate commerce.

### The Parties' Master Agreement, Operating Agreement, and Franchise Agreements

32.     Three overlapping agreements govern the relationship between Lefty's, Defendant Mallad, and Mallad's Defendant LLCs: The Master Agreement, the Lefty's Holdings, LLC Operating Agreement, and the Lefty's Franchising, LLC Franchise Agreement (Exhibit 5).

33.     The Master Agreement (and its 2021 Amendment (Exhibit 6)) established certain rights and responsibilities for Defendant Mallad, Nayfe Berry, and Lefty's Holdings. Among them is Defendant Mallad's right to build 20 Lefty's Cheesesteaks franchised restaurants.

34.     By signing the Master Agreement, Mallad agreed to a non-compete provision, which states in relevant part:

> a. **X. NON-COMPETE**. As a material inducement to sign this Agreement, Berry and Mallad agree that as long as they are members of Lefty's, and for two years from the date in which such member ceases to be a member of Lefty's for any reason (collectively the ("Restricted Period"), such member will not, directly or indirectly, in any capacity for himself or for herself or for the benefit of any person establish, engage, own, manage, operate, join or control, finance, guaranty or participate in the establishment,

9

ownership, management, operation or control, or financing of, or be a director, officer, employee, salesman, agent or representative of, or be a consultant to, or similarly deal with any other business, organization or firm which at any time during the restricted Period at a location within the United States of American (the "Territory") compete with the company's business.

35.     Less than one year after entering into the Master Agreement, Mallad, Nayfe Berry, and Plaintiffs amended the Master Agreement. The Amendment allowed Defendant Mallad to own and operate up to 50 Lefty's Cheesesteaks restaurants that would not be subject to any typical franchise fees or royalties. Before opening any restaurants under the Amendment, Mallad was required to execute "the then usual and customary Lefty's franchise agreement."

36.     The Master Agreement Amendment also provided Mallad with a defined exception to the parties' non-compete obligations. The provision allowed Mallad to develop a very specifically defined seafood and chicken restaurant concept based on menus attached to the Master Agreement Amendment. Exhibit 6, Amendment 5.

37.     Mallad also executed the Operating Agreement for Lefty's Holdings, which sets forth the rights and responsibilities of members of the Company. Exhibit 4. The Operating Agreement includes a provision known to the parties as the "Michigan Carve Out," which grants Nayfe Berry exclusive management and control over all Michigan Lefty's operations. The Michigan Carve Out states:

a. **6.5 Authority of the Managers**. The Managing Board shall have the power and authority on behalf of the Company to do or to delegate to officers of the Company any and all things necessary or convenient to carry out the business and affairs of the Company. **Notwithstanding anything in this agreement to the contrary, as it relates to management matters pertaining only to Michigan, Nayfe Berry (and/or her successor), and not the Managing Board, shall have sole management discretion in carrying out the business and affairs of the Company**, with the understanding that the franchise and licensed locations operating in Michigan shall adhere to the Company's franchise agreements and with the further understanding that the management decisions made by Nafye or her successor shall not cause a material injury to the Company or its goodwill.

38.     Mallad also agreed to a non-compete provision in the Operating Agreement that is nearly identical to the provision found in the Master Agreement, which states:

a. **10.1 Covenant Not to Compete**. As a material inducement to sign this Agreement, each member and Officer agrees that as long as it is a Member or Officer of the Company, and for two years from the date in which such Member or Officer ceases to be a Member or Officer of the Company for any reason (collectively the ("Restricted Period"), such Member or Officer will not, except with the managing board's express prior unanimous written consent, directly or indirectly, in any capacity for himself or for itself or for the benefit of any Person establish, engage, own, manage, operate, join or control, finance, guaranty or participate in the establishment, ownership, management, operation or control, or financing of, or be a director, officer, employee, salesman, agent or representative of, or be a consultant to, or similarly deal with any other business, organization or firm which at any time during the Restricted Period at a location within the United States of American (the "Territory") compete with the Company's Business.

39.     The Franchise Agreement governs the rights and responsibilities of Lefty's Franchising and its franchisees. Exhibit 5. All franchisees, including Mallad, must sign and adhere to the Company's franchise agreement to lawfully operate a Lefty's Cheesesteaks restaurant.

40.     Mallad has represented that he signed franchise agreements between Defendant LLCs and the Company, but he has refused Plaintiffs' requests to provide copies of the Agreements to Plaintiffs. Exhibit 7. In any event, the Franchise Agreements are binding on Mallad as he has benefited from their terms and his franchise relationship with Lefty's.

41.     By signing the Franchise Agreement, Mallad agreed to operate his restaurants in compliance with all aspects of the Franchise Systems specified by Lefty's Franchising. Exhibit 5. Article 8 of the Franchise Agreement includes multiple provisions outlining the scope of the Franchise System Standards. These include in relevant parts:

> a. **8.1 Continuing Operations and Best Efforts.** You acknowledge that the reputation and goodwill of the Franchise System is based in large part on offering high quality products and services to its customers. Accordingly, you shall provide or offer for sale or use at the Restaurant only those menu items, products, goods, supplies, uniforms, proprietary apparel, proprietary promotional items, small wares, paper products, items (including without limitations, vegetables, meats, oils, spices, sauces, salad dressings, soups, desserts, etc.), non-alcoholic beverages, supplies, and other items, products and services that we from time to time approve (and which are not

thereafter disapproved) and that comply with our Brand Standards Manual.

b. **8.2 Standards of Operation; Brand Standards Manual.** You acknowledge that every component of the Franchise Systems is important to us and to the operation of the Franchise Business. You must, at all times, operate and maintain the Franchise Business in a competent manner and in full compliance with all aspects of the Franchise Systems specified by us. In all business dealings with the public, you must be governed by the highest standards of honesty, integrity, fair dealing and ethical conduct. You must comply with all lawful and reasonable policies and procedures specified by us in connection with the operation of the Franchise Business. These specifications may include standards, techniques and procedures for: (a) the safety, maintenance, cleanliness, sanitation, function, hours of operation, and appearance of the Franchise Business and the equipment, fixtures, furniture, décor, signs, and Trade Dress used in the Franchise Business; (b) qualifications, dress, uniforms, grooming, general appearance, demeanor and training of employees; (c) the products and services required or authorized to be offered and sold by the Franchise Business; (d) type, shelf life, quality, taste, portion control, and uniformity and manner of preparation and sale of all of the products sold by the Franchise Business; (e) methods and procedures relating to receiving and preparing customer orders; (f) catering, delivery, on-line ordering, and use of third party delivery services; (g) sales, advertising and promotional techniques and programs…

c. **8.4 Acquisition of Products and Services.** You must obtain and use all equipment, fixtures, signs, Franchise Trade Dress, inventory, food products, packaging materials, paper and plastic products, menus, uniforms, and all other products and services that we specify for use in the operation of the Franchise Business.

d. **8.6 Specifications and Suppliers for Products and Services.** … Unless otherwise specified by us, you must acquire all products and services used in the design, development, construction, and operation of the Franchise Business, other than Designated Supplier Products, in accordance with our

specifications (which may include brand names) and only from a manufacturer, supplier, distributor, or professional or other service provider that has been approved by us (an "Approved Supplier"). An Approved Supplier will be a supplier that: (a) meets our standards for quality and uniformity of goods and services and other relevant standards established by us; (b) we have designated in writing as an Approved Supplier; and (c) we have not later revoked the designation as an Approved Supplier…

e. **8.7 Products and Services Offered by the Franchise Business.** You must sell all products and provide all services that we specify be provided by the Franchise Business….

f. **8.8 Pricing; Promotional Programs; Gift Cards.** We may exercise rights with respect to the pricing of Authorized Products to the fullest extent permitted by then-applicable law in order to enhance the competitive position and consumer acceptance for the products and services of Restaurants. These rights may include: (a) prescribing the maximum and/or minimum retail prices that you may charge customers for the products and/or services offered and sold at the Franchise Business; (b) recommending retail prices; (c) advertising specific retail prices for some or all products or services sold by the Franchise Business and requiring you to observe those prices; (d) engaging in marketing programs, promotional programs, drives, giveaways, discounts, coupons, contests and other campaigns and requiring you to participate in those programs, which may directly or indirectly impact your retail prices (e.g. the anniversary event requiring a "buy-one get-one free" promotion for three to five days); and (e)otherwise mandating, directly or indirectly, the maximum and/or minimum retail prices that the Franchise Business may charge the public for the products and services it offers.

42.     As he did in the Master Agreement and Operating Agreement, Mallad has also agreed to honor the Franchise Agreement's non-compete provision, which states:

a. **13.1 Covenant Not to Compete During Term.** You and your shareholders, officers, directors, partners, members, owners and investors, Family Members (defined in Section 13.4) and affiliates must not, during the term of this Agreement engage in any activity in competition with us or our franchisees and licensees, including involvement, whether as an owner (except ownership of no more than 1% of a publicly traded entity), director, officer, manager, employee, consultant, lender, representative or agent, or in any other capacity, or otherwise in any business that is involved, in whole or in part, in a "Competing Business" (defined in Section 13.4), (except other Restaurants operated under franchise agreements entered into with us), or in any business or entity that franchises, licenses, or otherwise grants to others the right to operate a Competing Business, unless you have received our prior written approval.

   i. **13.4(a) "Competing Business"** means any business that is the same or similar to a Restaurant, including a business that sells the same or similar food for carry-out, dine-in, catering, or delivery or other products that may be offered by Restaurants now or in the future.

43.    Mallad agreed that a violation of any of the above provisions would constitute a default and good cause for termination if he failed to cure within 30 days of a duly served Notice of Default, pursuant to Franchise Agreement Sections 15.4(l), (m), and (o).

44.    Mallad, like all franchisees, agreed that Lefty's had the right to terminate his Franchises and the Franchise Agreements with no right to cure if he received two or more notices of default for the same or a similar default during any consecutive 12-month period or if he received three more notices of default, whether

or not for the same or similar default, during any consecutive 12-month period, pursuant to Sections 15.3 (e) and (f) of the Franchise Agreement.

45.    Mallad agreed that his right to operate franchises under the Franchise Agreement would terminate upon delivery of written notice for violations under Section 15.3 or upon failure to cure violations of Section 15.4 within 30 days, pursuant to Section 15.5 of the Franchise Agreement.

**Mallad's Defaults under the Parties' Agreements**

46.    From the beginning, Mallad's actions have demonstrated a pattern of dishonesty and bad faith.

47.    Rather than establishing Lefty's as a national franchise, Mallad concentrated his efforts on opening his own royalty-free stores, three in California and one in Ohio, along with the twelve that he opened in Michigan. Most of these franchises are now closed.

48.    Mallad repeatedly failed to place the interests of Lefty's over his own interests, to the detriment of the Company and its members. Among Mallad's damaging actions were the following:

   a. Soliciting Lefty's franchisees and prospective franchisees to become partners and/or franchisees in a divorce-themed restaurant owned by Mallad known as "Ex-Wife's Famous Chicken" ("Ex-Wife's");

b.  Operating businesses that directly compete with Lefty's, including, without limitation, (i) operating multiple Lefty's franchise stores in the same location and adjacent to his Ex-wife's restaurants, and (ii) purchasing and operating Miller's Bar in Dearborn;

c.  Representing to vendors that Ex-Wife's Famous Chicken is an affiliate of Lefty's in order to obtain special pricing of products and services;

d.  Proposing to third parties a transaction, amounting to a scheme, which would enable Mallad to retain royalty-free status for his franchises while selling a minority interest in order to circumvent the terms of the Master Agreement and collect royalties/fees for himself, instead of the transferee paying royalties to Lefty's;

e.  The sale of alcoholic beverages in his San Diego franchise operation;

f.  Refusing to provide information to complete the Franchise Disclosure Document ("FDD") punch list and antagonizing the Company's auditor who was preparing financial information for the FDD;

g.  Ordering product from Lefty's vendors at favorable prices and using the product in a competing operation (Ex-Wife's Famous Chicken) by claiming that the two operations were affiliated;

h.  Failing to use authorized vendors;

i.   Failing to pay authorized vendors and thereby damaging Lefty's relationship with them;

j.   Limiting hours of operation and not having certain menu items available for customers;

k.   Conducting business at his Lefty's franchises in a way that dragged the Company into a Federal lawsuit asserting claims that Mallad and his Lefty's stores in Jackson and Lansing violated the Federal Fair Labor Standards by confiscating tips from employees.

49.   On March 8, 2023, Lefty's sent Mallad a cease-and-desist letter informing him that he was in breach of the parties' Master Agreement, Operating Agreement, and Franchise Agreements due to his ownership and operation of several Ex-Wife's restaurants in Michigan. Exhibit 8.

50.   Specifically, Mallad opened three Ex-Wife's restaurants, one of which was opened as a joint location with Lefty's Cheesesteaks. A Lefty's employee at this location was photographed wearing an Ex-Wife's t-shirt while serving a Lefty's customer.

51.   On July 21, 2023, Lefty's sent Mallad a second cease-and-desist letter after he opened an additional Ex-Wife's restaurant in Westland, Michigan adjacent to the Lefty's Westland location. Exhibit 9.

18

52.     On November 22, 2023, Lefty's sent Mallad a third letter notifying Mallad that he continued to be in breach of his agreements through his operation of Ex-Wife's restaurants. Exhibit 10. Lefty's also demanded Mallad cure additional defaults, including:

a.  The failure to use approved vendors for products in violation of Sections 8.1 and 8.2 of the Franchise Agreement.

b.  The failure to use the Lefty's approved menus in violation of Sections 8.1 and 8.2 of the Franchise Agreement.

c.  The failure to honor national promotional programs authorized by Lefty's in violation of Section 8.2 of the Franchise Agreement. This includes Lefty's' annual Left-Handers Day half-off cheesesteaks promotion.

d.  The failure to return a signed Franchise Agreement for each of Mallad's locations.

53.     The November 22, 2023 letter stated that Nayfe Berry maintained sole management authority and discretion over Mallad's Michigan franchise locations, pursuant to the Michigan Carve Out provision in the Lefty's Holdings Operating Agreement and warned that Lefty's would terminate Mallad-owned franchises in Michigan if he did not cure these defaults within 30 days.

54.     On January 9, 2024, several news outlets reported that Mallad purchased Miller's Bar in Dearborn, Michigan. Mallad's purchase and operation of Miller's bar constituted a further breach of his multiple non-compete agreements.

55.     On January 14, 2024, Lefty's sent Mallad a Notice of Termination, terminating all franchise agreements between Lefty's and Allie T. Mallad and Mallad-owned enterprises based upon his breach of his non-compete agreements and additional defaults described in the November 22, 2023 Notice of Default. Exhibit 11. The Notice of Termination described Mallad's obligations following the termination of his Franchise Agreements.

<u>**Mallad's Post-Termination Obligations**</u>

56.     Under Article 16 of the Franchise Agreement (Exhibit 5), Mallad agreed that his "rights to use the Intellectual Property and the Franchise Systems and all other rights associated with being an authorized Lefty's Cheesesteaks franchisee will cease" upon termination of the Franchise Agreement.

57.     In particular, Mallad agreed that, upon termination of his franchise, he would:

a. Immediately and permanently discontinue the use of Lefty's Intellectual Property, the Confidential Information, the Franchise Systems, and any trademarks, names, and logos confusingly similar to the Marks or Trade Dress (Franchise Agreement Section 16.1(a))

20

b.  Immediately discontinue all advertising placed or ordered and remove and deliver to Lefty's all sign faces, advertising and promotional material, letterhead, forms, and any other items containing the Intellectual Property or the Confidential Information. (*Id*. § 16.1(b)).

c.  Cease using the Brand Standards Manual, the Confidential Information, and all other proprietary business information provided by Lefty's. (*Id*. § 16.1(c)).

d.  Immediately and permanently cease to use all telephone and fax numbers, email addresses, website addresses, domain names, and other electronic media that have been used in the Franchise Business. (*Id*. § 16.1(d)).

e.  Cease using any business name containing any of the Lefty's Marks and file an abandonment or discontinuance of the name with the appropriate local, county, or state agency. (*Id*. § 16.1(e)).

58.    Mallad further agreed that he would not own or operate a competing business within 50 miles of a Lefty's franchise for a period of two years following the termination of his Franchise Agreements. (*Id*. § 13.2).

59.    In response to Lefty's Notice of Termination, Mallad, through his attorney, refused to cease operating his Lefty's franchises or take any of the actions required of a franchisee following the termination of their franchise.

60.     Mallad has not sought to enjoin Lefty's termination of his Franchise Agreements in a court of competent jurisdiction.

61.     Mallad's actions have caused and continue to cause irreparable harm to Lefty's, including harm to Lefty's reputation and goodwill.

62.     Lefty's has incurred significant costs enforcing the terms of the parties' Franchise Agreements, for which Mallad is obligated to reimburse Lefty's under Section 18.6 of the Franchise Agreement.

63.     Lefty's has sought to resolve many of its disputes with Mallad through binding arbitration pursuant to the parties' Master Agreement and Operating Agreement. However, Section 18.2 of the parties' Franchise Agreements states that disputes over the ownership or validity of Franchise Marks and suits by Lefty's for injunctive relief are not subject to negotiation or arbitration.

## COUNT I
## Breach of Contract

64.     The allegations of paragraphs 1 through 63 are hereby incorporated by reference.

65.     The conduct described in this Complaint constitute material breaches of the contractual provisions of the parties' Master Agreement, Operating Agreement, and Franchise Agreements cited herein.

66.     These breaches constitute good cause for terminating the Franchise Agreements. Defendants' continued operation following the Franchise Agreements' termination also constitutes breaches of the agreements' post-termination obligations.

67.     As a direct and proximate result of these actions, Lefty's has suffered and is continuing to suffer irreparable injury and monetary damages in an amount that has yet to be determined.

## COUNT II
## Trademark Infringement

68.     The allegations of paragraphs 1 through 67 are hereby incorporated by reference.

69.     The use in commerce of Lefty's trademarks and trade names by Mallad and Defendant LLCs outside the scope of the Franchise Agreements and without Lefty's consent is likely to confuse or deceive the public into believing, contrary to fact, that the unauthorized activities of Mallad are licensed, franchised, sponsored, authorized, or otherwise approved by Lefty's. Such unauthorized use of Lefty's trademarks and trade names infringes its exclusive rights in its trademarks under § 32 of the Lanham Act, 15 U.S.C. § 1114, and applicable state law.

70.     The acts of Mallad and Defendant LLCs were and are being undertaken knowingly and intentionally to cause confusion, or to cause mistake, or to deceive.

71.     As a direct and proximate result of these actions, Lefty's has suffered and is continuing to suffer irreparable injury and has incurred and is continuing to incur monetary damages in an amount that has yet to be determined.

### COUNT III
### Unfair Competition

72.     The allegations of paragraphs 1 through 71 are hereby incorporated by reference.

73.     The use in commerce of Lefty's trademarks, trade names, and trade dress by Mallad and Defendant LLCs outside the scope of the Franchise Agreements is likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of their goods, services, or commercial activities. Such unauthorized use of Lefty's trademarks and trade names violates § 43 of the Lanham Act, 15 U.S.C. § 1125(a), and applicable state law.

74.     The acts of Mallad and Defendant LLCs were and are being undertaken knowingly and intentionally to cause confusion or  mistake, or to deceive.

75.     As a direct and proximate result of these actions, Lefty's has suffered and is continuing to suffer irreparable injury and has incurred and is continuing to incur monetary damages in an amount that has yet to be determined.

24

## COUNT IV
## Trade Dress Infringement

76.     The allegations of paragraphs 1 through 75 are hereby incorporated by reference.

77.     Mallad and Defendant LLCs' restaurants are identified by signs, exterior appearance, packaging, containers, and other items on which the Lefty's proprietary marks appear in the same distinctive style and color scheme as Lefty's uses for the restaurants operated by Lefty's licensees.

78.     Mallad and Defendant LLCs' use of trade dress that is identical or confusingly similar to the Lefty's trade dress outside the scope of the Franchise Agreement constitutes a false designation of the origin of the Mallad and Defendant LLCs' restaurants, which is likely to cause confusion, or to cause mistake, or to deceive the public as to the affiliation, connection, or association of their restaurants with the Lefty's restaurants operated by Lefty's licensees. Such adoption of Lefty's trade dress violates § 43 of the Lanham Act, 15 U.S.C.§ 1125, and the common law.

79.     The acts of Mallad and Defendant LLCs were and are being undertaken knowingly and intentionally to cause confusion cause mistake, or to deceive.

80.     As a direct and proximate result of these actions, Lefty's has suffered and is continuing to suffer irreparable injury and has incurred and is continuing to incur monetary damages in an amount that has yet to be determined.

## **PRAYER FOR RELIEF**

### **WHEREFORE, Plaintiffs ask the Court for the following relief:**

A.     The entry of a declaratory judgment holding that Defendants' conduct has violated the terms of the Franchise Agreements and constitutes good cause for terminating the Franchise Agreements;

B.     The entry of declaratory judgment ratifying and enforcing the termination of the Franchise Agreements as of January 14, 2024, the effective date of Lefty's Notice of Franchise Agreement Termination, or as otherwise provided by applicable law;

C.     The entry of a preliminary and permanent injunction enjoining Defendants, and all those acting by, through, or in concert with them, from using the Lefty's trademarks, trade names, and trade dress, and from otherwise engaging in unfair competition with Lefty's;

D.     The entry of an injunctive order directing Defendants, and all those acting by, through, or in concert with them, to comply with all applicable post-termination obligations as provided in the Franchise Agreements, including but not limited to promptly paying all sums owed to Lefty's and its affiliates, complying with the post-termination non-compete, complying with any request from Lefty's to purchase any equipment or other assets of the franchise, and taking all steps to

transfer their leasehold interests in the franchise to Lefty's or its designee in the event that Lefty's elects to exercise any rights it or any of its affiliates or subsidiaries might have in such interests;

    E.    Award Plaintiffs their costs and attorneys' fees incurred in connection with this action, pursuant to Section 18.6 of the parties' Franchise Agreements and Section 35 of the Lanham Act, 15 U.S.C. § 1117; and

    F.    Award Plaintiffs such other relief in its favor as this Court may deem just and proper.

Dated: January 31, 2024

/s/ David H. Fink
David H. Fink (P28235)
Nathan J. Fink (P75185)
Calder A.L. Burgam (P87203)
FINK BRESSACK
*Counsel for Plaintiffs*
38500 Woodward Ave, Suite 350
Bloomfield Hills, MI 48304
Tel: (248) 971-2500
dfink@finkbressack.com
nfink@finkbressack.com
cburgam@finkbressack.com

## **VERIFICATION**

I, Hussein "Sam" Berry, verify that I have read the verified Complaint and the facts of which I have personal knowledge are true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATED: 1/31/24

Hussein "Sam" Berry, President,
Lefty's Holdings, LLC and Lefty's
Cheesesteaks Franchising, LLC

27